William J. Hughes, Jr., Esq.(1924)
COOPER LEVENSON APRIL NIEDELMAN
& WAGENHEIM, PA
1125 Atlantic Avenue - 3rd Floor
Atlantic City, NJ 08401
(609) 344-3161
Attorneys for Plaintiff

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| JOHN G. BERG | : | |
| Plaintiff, | : | Civil Action |
| v. | : | No. 05-1060C |
| JOHN H. SNOW, SECRETARY OF THE TREASURY OF THE UNITED STATES | : | |
| Defendants. | : | |

---

**PLAINTIFF'S BRIEF IN REPLY TO DEFENDANT'S TO MOTION TO DISMISS**

---

## PRELIMINARY STATEMENT

Plaintiff John Berg initiated this action because a U.S. District Court found that his claim established the existence of a contract and that jurisdiction is properly laid in this Court. Now, the defendant seeks to ignore the finding of the District Court and move for dismissal based upon the lack of a contract. For the reasons set forth herein, it is respectfully submitted that Berg has stated a cause of action which is cognizable and timely filed.

## PROCEDURAL HISTORY

On April 12, 2005, Plaintiff Berg filed his claim in U.S. District Court for the Eastern District of Pennsylvania seeking, among other things, equitable redress to enforce the agreement entered into between him and the defendant. See Hughes Cert., Exhibit 1. On September 23, 2004, the defendant filed its Answer. Id., at Exhibit 2. On April 12, 2005, the District Court denied Berg's motion for judgment on the pleadings and granted the defendant's cross-motion to dismiss, ***without prejudice***. Id., at Exhibit 3. The District Court subsequently denied Berg's motion for reconsideration, and berg filed the instant action.

## FACTUAL BACKGROUND

The facts of the instant case are few and straight-forward. Because of questions relating to certain loss deductions, from

in or about February to April 1991, defendant Internal Revenue Service ("IRS") conducted an audit of plaintiff taxpayer John Berg ("Berg"). Hughes Cert., at Exhibit 1, ¶¶ 5-6; Hughes Cert., at Exhibit 2, ¶¶ 5-6. The audit focused on tax years 1986 through and including tax year 1989. Complaint, at Exhibit 1, page 1; Hughes Cert., at Exhibit 2, ¶ 12 (admitting the authenticity of the audit report).

As a result of the audit, the Revenue Agent determined, and Berg agreed, that Berg had underpaid his 1989 Federal Income Taxes by $134,058.67. Complaint, at Exhibit 1, page 2; Hughes Cert., at Exhibit 1, ¶ 7; Hughes Cert., at Exhibit 2, ¶ 7. ***The Revenue Agent, however, further determined, and Berg agreed, that Berg had been over-assessed and had overpaid $179,241 for tax year 1986.*** Complaint, at Exhibit 1, page 2; Hughes Cert., at Exhibit 1, ¶ 8; Hughes Cert., at Exhibit 2, ¶ 8.

At the conclusion of the audit, the IRS' revenue agent prepared a report of his conclusions. Hughes Cert., at Exhibit 1, ¶ 12; Hughes Cert., at Exhibit 2, ¶ 12. This report was signed by the Revenue Agent, the Revenue Agent's Supervisor, and John Berg. Complaint, at Exhibit 1, page 2; Hughes Cert., at Exhibit 1, ¶¶ 13-14; Hughes Cert., at Exhibit 2, ¶¶ 13-14.

On the first page of the report, line 15 denotes that Berg had overpaid his 1986 Federal Income Taxes by $179,241.

Complaint, at Exhibit 1, page 2. Specifically, on line 15, the report states:

**Balance Due or (Overpayment), not including interest | (179,241.00) |**

Id. On the same page, the report further states that, as a result of the audit, the IRS would allow Berg's claim for a refund for tax year 1986:

> ON 12-24-87 YOU FILED CLAIM FORM 1040-X FOR A ***REFUND*** OF $179,241 FOR 1986. ***AS A RESULT OF OUR EXAMINATION, WE HAVE ALLOWED YOUR CLAIM IN FULL.*** HOWEVER OTHER ADJUSTMENTS ARE INCLUDED IN THIS REPORT.

Id. (emphasis added).

On the second page of the report, the Revenue Agent made findings with respect to tax year 1989. Complaint, at Exhibit 1, page 3. On line 15, the Revenue Agent indicated that, not including interest, Berg had underpaid his 1989 Federal Income Taxes by approximately $99,559 (the amount was subsequently increased at the District level). Id.

At the bottom of each of pages 1 and 2 of the report, Berg signed the following acknowledgement:

> Consent to Assessment and Collection – I do not wish to exercise my appeals rights with the Internal Revenue Service or to contest in the United States Tax Court the findings in this report. Therefore, I give my consent to the immediate assessment and collection of any increase in tax and penalties, and accept any decrease in tax and penalties shown above, plus interest as provided by law. It is understood that this report is subject to acceptance by the District Director.

Id.

It should also be noted that one of the adjustments made by the Revenue Agent in the report concerned Berg's Schedule C losses with respect to the 1987 tax year. Complaint, at Exhibit 1, page 4. Although not directly relevant to the issues in the instant case, the Revenue Agent's explanation as to the reason for this adjustment demonstrate the errors which occurred by the IRS with respect to Berg's tax files. As explained by the Revenue Agent:

> The adjustment is to correct an error which occurred at the Philadelphia Service Center when the return was processed. ***Apparently the net Schedule C loss as reported was not posted***. . . . The purpose of this adjustment is to make the revenue agent's report agree with the return as it is reflected in the computer. The adjustment has no effect on the return as filed.

Id.

Additionally, it should be noted that the report also included a calculation of the interest owed on Berg's $179,241 *overpayment*. Complaint, at Exhibit 1, page 14. In clear typeface utilized by the IRS, the report indicates that an amount of $76,199 was due in interest from the IRS for the period from 1986 through and including the time of May 10, 1991. Id.

The IRS subsequently commenced an enforcement action against Berg for the payment of the 1989 tax underpayment. Attempting to resolve the matter, Berg submitted offers in compromise in 1995 and again in 1999 which were consistent with

the understandings set forth in the revenue agent's 1991 report, and each time he reminded the IRS that these issues had been previously resolved. Complaint, at Exhibit 2; Hughes Cert., at Exhibit 1, ¶¶ 24 and 27; Hughes Cert., at Exhibit 2, ¶¶ 24 and 27. On August 4, 1995, and again on July 30, 2002, the IRS rejected each of these offers. Complaint, at Exhibit 3; Hughes Cert., at Exhibit 1, ¶¶ 25 and 29; Hughes Cert., at Exhibit 2, ¶¶ 25 and 29. Each time, the IRS indicated – and contrary to the report which allowed his refund claim – that it had no record that Berg was entitled to a refund.

Much like the IRS' admitted failure to post his 1987 Schedule C losses, the IRS had no records relating to Berg's payment of his 1986 Federal Income Taxes. Well beyond the time that any bank would keep records of Berg's checks and financial transactions, Berg was unable to provide any documentary proof that the IRS owed him money beyond the IRS' own report which admitted that Berg was entitled to a $179,241 refund.

The above stated facts are not in dispute, as the defendant has already admitted to the operative facts underlying this dispute. As recognized by the District Court, "***both parties admit entering into a settlement agreement following the 1991 audit*** . . . ." Hughes Cert., at Exhibit 3, page 3 (emphasis added). In so doing, the District Court found that this was an

action in contract and that proper jurisdiction is in the U.S. Court of Claims.

Despite the District Court's findings and despite its admissions to the contrary, the defendant now moves to dismiss Berg's Complaint. Berg opposes this motion.

## ANALYSIS

### A. The Doctrines of Collateral Estoppel and Judicial Estoppel Bar the Government from Arguing that there was no Contract

The District Court found that the Government admitted that there was a settlement agreement in the instant case. See Hughes Cert., at Exhibit 3, pages 1, 3. In the court's memorandum opinion, it stated:

> In 1991, the Internal Revenue Service (IRS) performed an audit of Plaintiff. As a result of this audit, ***Plaintiff and Defendant entered into a settlement agreement*** reflecting that Plaintiff was deficient $134,058.67 plus interest for 1989 and had been over assessed $179,241.00 plus interest for 1986.

Id. at page 1. Furthermore, the District Court noted that both parties ***admitted*** to entering into a settlement agreement. Id., at page 3. Because the District Court found that this action undisputedly sounded in contract, and the amount in controversy exceeded $10,000, jurisdiction was properly laid in the U.S. Court of Claims. Id. at page 4.

The defendant's admissions to which the District Court referred came in the form of the defendant's pleadings and arguments to the District Court in support of its motion to

dismiss Berg's Complaint. Given these admissions and the District Court's findings, the defendant cannot now reverse course and argue that there was no contract.

Under the doctrine of collateral estoppel, the defendant cannot raise a factual issue which was raised and resolved in a separate proceeding involving the same parties. Bailey v. United States, 46 Fed. Cl. 187, 203 (2000). As recognized in Bailey:

> A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the same parties or their privies . . . ." Southern Pacific R. Co. v. United States, 168 U.S. 1, 48-49, 42 L. Ed. 355, 18 S. Ct. 18 (1897). . . . ***Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation***. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5, 58 L. Ed. 2d 552, 99 S. Ct. 645 (1979); Scott, Collateral Estoppel by Judgment, 56 Harv. L. Rev. 1, 2-3 (1942); Restatement (Second) of Judgments § 68 (Tent. Draft No. 4, Apr. 15, 1977) (issue preclusion). Application of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions. Southern Pacific R. Co., supra, at 49; Hart Steel Co. v. Railroad Supply Co., 244 U.S. 294, 299, 61 L. Ed. 1148, 37 S. Ct. 506 (1917). To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

Bailey, 146 Fed. Cl at 203 (quoting Montana v. United States, 440 U.S. 147, 153-54, 59 L. Ed. 2d 210, 99 S. Ct. 970 (1979) (footnote omitted)) (emphasis added).

In the instant case, the District Court found that there was a contract and that both parties admitted to the existence of this contract. It was because of this finding that the Court determined that it lacked jurisdiction. As such, it is respectfully submitted that the defendant should not be allowed to re-litigate this fact issue by reversing its position which previously allowed it to reign victorious.

In a similar vein, the defendant is not allowed to switch its position now that it believes that its interests have changed. Under the doctrine of judicial estoppel, the defendant is barred from taking a position opposite to its stance in the District Court:

> The doctrine of judicial estoppel prevents a party from changing its position during litigation "simply because his interests have changed." New Hampshire v. Maine, 532 U.S. 742, 748, 149 L. Ed. 2d 968, 121 S. Ct. 1808 (2001). When determining whether to apply judicial estoppel, courts may examine several factors, including whether the party successfully persuaded the court to accept its original position and whether the party would receive "an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Id. at 751.

Hansen Bancorp, Inc. v. United States, 67 Fed. Cl. 411, 431-32 (2005). As stated in Cuyahoga Metro. Housing Auth. v. United States, 65 Fed. Cl. 534 (2005), "'The doctrine of judicial

estoppel,' the Federal Circuit has stated, 'is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed.'" Id. at 554 (citing Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1565 (Fed. Cir. 1996)).

In the instant case, the defendant successfully argued that the instant case involved a contract between Berg and the United States and that the District Court did not have jurisdiction. Agreeing with the defendant, the District Court granted the defendant its requested relief, ***without prejudice***, fully anticipating that the interpretation of the contract would be left to the Court of Claims to consider. Having won in the previous proceeding, the defendant cannot now reverse its position and argue that there was no contract.

This position greatly prejudices Berg because his initial Complaint sought equitable relief, a remedy unavailable to him in the Court of Claims. By reversing its previous admissions and arguing that there was no settlement agreement, the defendant effectively seeks to deny Berg any opportunity to have his day in Court. Accordingly, it is respectfully submitted that the existence of the contract, i.e., the settlement agreement, is an established fact which the defendant cannot now deny.

**B. <u>There was a Contract between Berg and the Defendant</u>**

Even assuming, *arguendo*, that the Court were to entertain the defendant's arguments relating to the existence of a contract, both the facts and the law are in Berg's favor. Notwithstanding the defendant's citations to IRS regulations, case law conclusively demonstrates that settlement agreements are not limited to those that are circumscribed by the defendant's own interests.

At its core, the Revenue Agent's audit report constitutes a binding agreement between the IRS and Berg. In both law and fact, this conclusion is unassailable. The Revenue Agent made certain findings and conclusions, and Berg agreed with them. In exchange for their mutual assent to resolve the issues relating to the tax years in question, and to forego further administrative proceedings, each of the parties agreed to be bound by the conclusions of the report. This is evidenced in the language contained in the report itself above Berg's signature. This section states:

> Consent to Assessment and Collection – I do not wish to exercise my appeals rights with the Internal Revenue Service or to contest in the United States Tax Court the findings in this report. Therefore, I give my ***consent*** to the immediate assessment and collection of any increase in tax and penalties, and ***accept*** any decrease in tax and penalties shown above, plus interest as provided by law. ***It is understood that this report is subject to acceptance by the District Director.***

Complaint, at Exhibit 1, page 2 (emphasis added). This conditional acceptance was solely contingent upon the acceptance by the office of the District Director. This was accomplished, and the agreement was fully effective, through the subsequent counter-signature of the Revenue Agent's supervisor. Complaint, at ¶¶ 13-14; Answer, at ¶¶ 13-14. Evidence of additional acceptance is also gleaned by the IRS' acceptance of the portions of the Revenue Agent's report which addressed Berg's 1989 tax liability. That is, the IRS subsequently relied upon this report, and Berg's acceptance of it, as a basis to pursue its collection for Berg's 1989 Tax liability. Hence, the subsequent conduct of the IRS is additional evidence, beyond the signatures of the IRS' officials, of the IRS' assent to the findings, conclusions, and terms of the Revenue Agent's report.

Although it appears that this issue has not been addressed by the Third Circuit, the issue concerning the enforcement of settlement agreements with the IRS has been addressed by other circuits, the U.S. Court of Federal Claims and by the U.S. Tax Court. In Buesing v. United States, 42 Fed. Cl. 679 (1999), the U.S. Court of Federal Claims found that a contract, i.e. a settlement agreement, was formed between a taxpayer and an IRS Revenue Officer. Although the Tax Court dismissed the portions of the taxpayer's complaint which requested specific performance – because the Congress did not confer to the Court of Claims the

ability to grant equitable relief as it had to the District Courts – the U.S. Court of Claims found that the Revenue Officer had the ability to bind the IRS in a contract. Id. at 692. In so doing, the court engaged in an extensive analysis of the cases and standards under which it determined that the IRS had entered into a settlement contract with the taxpayer. Id. at 686-692.

The starting point is the definition of a settlement agreement itself, which may be found in the Fifth Circuit case of Estate of Kokernot v. Commissioner, 112 F.3d 1290 (5th Cir. 1997). In that case, the Fifth Circuit stated:

> A settlement agreement is a contract; mutual forbearance supplies the consideration. As such, we interpret its terms using general contract law principles. Treaty Pines Invs. Partnership v. Commissioner, 967 F.2d 206, 211 (5th Cir. 1992). If the language of the agreement is unambiguous, we will not consider any extrinsic evidence: the meaning will be determined from the terms encompassed within the proverbial four corners of the agreement. Goldman, 39 F.3d 402, 406. Where the language is not so clear, however, we will examine the language within the context of the circumstances surrounding the execution of the agreement. Robbins Tire & Rubber Co. v. Commissioner, 52 T.C. 420, 435-436, 1969 WL 1677 (1969).

Id. at 1294; see also, Goldman v. Commissioner, 39 F.3d 402, 405-406 (2d Cir. 1994). As similarly noted by the U.S. Tax Court:

> The settlement of tax cases is governed by general principles of contract law. A settlement agreement is in essence a contract. Each party agrees to concede some

> rights which he or she may assert against his or her adversary as consideration for those secured in the settlement agreement. Saigh v. Commissioner, 26 T.C. 171, 177 (1956). In determining the proper meaning of the terms of the agreement, we look to the language of the agreement and the circumstances surrounding its execution. Robbins Tire Co. v. Commissioner, 52 T.C. 420, 435-436 (1969). Generally, extrinsic evidence will not be admitted to expand, vary, or explain the terms of a written agreement unless the agreement is ambiguous. Rink v. Commissioner, 100 T.C. 319, (1993), affd., 47 F.3d 168 (6th Cir. 1995); Woods v. Commissioner, 92 T.C. 776, 780-781 (1989). Petitioner bears the burden of proving that his interpretation of any ambiguous contract language is correct. Rule 142(a); Rink v. Commissioner, 100 T.C. at 326.

Washoe Ranches #1 Ltd. V. Commissioner, T.C. Memo 1996-495, 1996 Tax Ct. Memo LEXIS 511 (1996).

In the instant case, it is respectfully submitted that the Revenue Agent's report meets all of the criteria as both an express and an implied-in-fact contract. An express contract is written and definitive. An implied-in-fact is not written, but comprises all of the elements of an express contract. As described by the Supreme Court in Hercules Inc. v. United States, 516 U.S. 417, 116 S. Ct. 981, 986 (1996):

> An agreement implied in fact is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from ***conduct*** of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Baltimore & Ohio R. Co. v. United States, 261 U.S. 592, 597, 43 S. Ct. 425, 426-427, 67 L. Ed. 816 (1923).

Id. (emphasis added). The Court in Buesing set forth at length the elements of each:

> A valid express contract requires that the following criteria have been met: "a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." Total Medical Management, Inc. v. United States, 104 F.3d 1314, 1319 (Fed. Cir. 1997), cert. denied, 522 U.S. 857, 139 L. Ed. 2d 101, 118 S. Ct. 156 (1997). . . .
>
> An implied-in-fact contract can only exist in the absence of an express contract. Algonac Mfg. Co. v. United States, 192 Ct. Cl. 649, 673, 428 F.2d 1241, 1255 (1970), supplemented by Algonac Mfg. Co. v. United States, 198 Ct. Cl. 258, 458 F.2d 1373 (1972). In order to establish jurisdiction based on an implied-in-fact contract, the plaintiff must establish the elements of a contract, including offer, acceptance, consideration, mutuality of intent, and definiteness of terms. . . . The plaintiff also must establish that the government official who allegedly formed the contract had actual authority to bind the government. . . .

42 Fed. Cl. at 688 (string citations omitted).

Accordingly, courts have found that the United States has entered into a binding contract through evidence of letters, Mutual Life Insurance Co. v. United States, 29 Fed. Cl. 157, 161 (1993); through verbal negotiations and letter exchange, Cities Service Gas Co. v. United States, 500 F.2d 448, 451-52 (Ct. Cl. 1974); and even through the subsequent conduct of one of the parties indicating an acceptance to the terms of the contract, Kuurio v. United States, 429 F.Supp. 42, 64 (S.D. Tex. 1970) ("a contract will arise if conduct by the original offeror following the receipt of the late acceptance amounts to an acceptance of the counteroffer."). Such evidence exists in the instant case.

Evidence of the intent of the parties to agree to be bound by the conclusions of the audit is contained within the four-corners of the Revenue Agent's report. The IRS' regulations, 26 C.F.R. § 601.105(b)(4) expressly give the taxpayer the choice to accept or to reject the report's conclusions. If the taxpayer agrees, then he or she is to sign the waiver which is contained in the report. By the express conditions of the waiver, the report is binding only after it is accepted by the office of the District Director.

The consideration for this contract is supplied through the mutual forbearance. Estate of Kokernot, 112 F.3d at 1294. For the IRS, this is seen through their acceptance of the conclusions in the report and forbearance of seeking additional adjustments. For Berg, it is through his agreement to forbear pursuing additional administrative remedies.

The final acceptance of this contract is evidenced both through the IRS' supervisor's countersignature, Hughes Cert., Exhibit 2 at ¶ 14, and the IRS' subsequent conduct with respect to the IRS' findings concerning the 1989 tax year. That is, the IRS subsequently began enforcement proceedings against Berg based upon the determinations contained in the audit report. Rather than proceeding through the normal administrative process of assessment and appeal, the IRS subsequently instituted immediate collection proceedings. This is crucial evidence of

the IRS' assent to conclusions of the report as Berg had agreed to immediate assessment through his signature on the report indicating his waiver. Accordingly, the IRS is estopped from asserting that it did not enter into a contract with Berg.

The determination of the existence of an agreement between Berg and the IRS is relevant because the report indicates that the IRS had allowed a claim for a refund for the 1986 tax year which was to be offset by the liabilities for the 1989 tax year. In two places on the first page of the report, the IRS indicates that Berg had ***overpaid*** his 1986 taxes and that the ***IRS had allowed his claim for a $179,241 refund***. Complaint, at Exhibit 1, page 2. Also in clear type, the report states that the claim is subject to other adjustments contained in the report. Id. In full, this paragraph states:

> ON 12-24-87 YOU FILED CLAIM FORM 1040-X FOR A ***REFUND*** OF $179,241 FOR 1986. ***AS A RESULT OF OUR EXAMINATION, WE HAVE ALLOWED YOUR CLAIM IN FULL. HOWEVER OTHER ADJUSTMENTS ARE INCLUDED IN THIS REPORT.***

Id. (emphasis added). Accordingly, the report clearly states that the IRS had allowed Berg's claim for a refund, but this refund is subject to the tax liability determination for the 1989 tax year.

In response, the IRS claims that it has no record that Berg ever paid his 1986 taxes. Similar to IRS' admission that it had erroneously failed to post his 1997 Schedule C losses, the

Service claims that these records are non existent. It is respectfully submitted, however, that this Court should not entertain such arguments. In the audit report itself, the IRS ***does not*** suggest in any way that Berg had failed to pay his 1986 taxes, nor does it state that the 1986 assessment was abated. Quite the contrary, the IRS states in the report that it will allow Berg's ***claim*** for a ***refund***, subject to the 1989 adjustments. In an area just above this paragraph, the report states that Berg submitted an ***overpayment in 1986.*** The fact that the defendant included in its revenue agent's report a detailed analysis of the interest that ***the defendant owed Berg*** as a result of his 1986 overpayment underscores the fact that such an overpayment did indeed occur. Accordingly, it is respectfully submitted that the parol evidence rule applies and that the Court need not look beyond the four corners of the report to determine that the IRS admitted in 1991, when it fully examined all of Berg's records, that he had overpaid his 1986 taxes and that he was entitled to a refund, subject to the 1989 offset.

In sum, it is respectfully submitted that the Revenue Agent's audit report, as signed by Berg, the Revenue Agent and the IRS Supervisor, and as acted upon by the IRS, constituted a valid and binding contract upon the IRS. The terms of this contract, as clearly indicated in the report itself, allowed

Berg's claim for a $179,241 refund, which was offset by the adjustments for the 1989 tax year.

**C. <u>The Defendant Cannot Enjoy a Presumption of Correctness</u>**

The core issue of this action is whether Berg paid his 1986 taxes. According to the revenue agent's report, he did. According to the defendant's transcripts, he did not. In making its case to this Court, however, the defendant argues that its records are entitled to a presumption of correctness – except for those portions of its records which might cause them to lose this case.

In footnote 1 of the defendant's brief (page 4), the defendant states that its records are entitled to a presumption of correctness. On the next footnote, below the first, the defendant states that the express admission that Berg overpaid his 1986 taxes is a mistake! In doing so, the defendant wishes the Court to overlook the fact that it accounted for all of the interest that the defendant owed Berg in the revenue agent's report itself. Given this admission and the fact that the defendant admitted in the revenue agents report that Berg's taxpayer transcript contained at least one other mistake, <u>Complaint</u>, Exhibit 1 at page 4, it is apparent that the defendant's records are not entitled to a presumption of correctness. Quite simply, just like the defendant's

vacillating position with the existence of a contract, the defendant cannot have it both ways.

### D. Berg's Action was Timely Filed

Contrary to the assertions of the defendant, Berg continuously pursued his rights with respect to the 1991 audit report. As clearly demonstrated on Exhibit 2 to the Complaint, the IRS' ***final action*** with respect to John Berg's claim was completed on ***July 17, 2002***, when the IRS finally completed its internal appeals process, i.e., the IRS' final administrative action. This is when the claim arose.

It must be emphasized that John Berg's position throughout the offer-in-compromise and appellate phase was solely based upon the understandings resulting from the 1991 audit and evidenced in the 1991 audit report. With the IRS' final rejection of Berg's appeal of its rejection of the offer-in-compromise (a nearly eight-year process) in July of 2002, it is respectfully submitted that the statute of limitations began to toll at that point, as Berg had exhausted all administrative remedies. That is, the exhaustion of administrative remedies arose from the final appeal decision, not the rejection of the second offer in compromise.[1]

---

[1] The defendant's assertion that there was no dispute pending when Berg filed his offer in compromise is incorrect. By their own admission, the defendant filed liens against Berg's property in 1994 and 1995, and Berg throughout this time filed his offers-in-compromise and utilized the

To the extent that the defendant argues that Berg failed to file for a refund within the statutory time-period, the defendant's own documents contradict this position. In the revenue agent's report, it clearly states:

> ON 12-24-87 ***YOU FILED CLAIM FORM 1040-X FOR A REFUND*** OF $179,241 FOR 1986. AS A RESULT OF OUR EXAMINATION, WE HAVE ALLOWED YOUR CLAIM IN FULL. HOWEVER OTHER ADJUSTMENTS ARE INCLUDED IN THIS REPORT.

Complaint, Exhibit 1 at page 2 (emphasis added). This case is not like the situations posed to the court in Mobile Corp. v. United States, 52 Fed. Cl. 337 (2002) and Lockheed Martin Corp. v. United States, 39 Fed. Cl. 197 (1997). In those cases, the taxpayers failed to claim refunds in the first instance within the statutorily mandated time.

In the instant case, the defendant acknowledges that Berg filed his claim for refund within the proper time. Complaint, Exhibit 1 at page 2. Thereafter, Berg continuously pursued his administrative remedies until the final action on July 17, 2002. It is respectfully submitted that this is when the statute of limitations began to toll, therefore making this action timely.

---

defendant's internal appeals process. It is the defendant's final action on Berg's appeal which triggered the statute of limitations.

## CONCLUSION

For the reasons set forth herein, it is respectfully submitted that the Court should deny the defendant's motion to dismiss the Complaint.

Respectfully submitted,

Cooper Levenson April
Niedelman & Wagenheim, P.A.

By /s/ William J. Hughes, Jr.
William J. Hughes, Jr. (1924)
Attorneys for Plaintiff, Berg

Dated: 1/24/06

CPAC; 639964.1